UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

CHOBANI, LLC,

                  Plaintiff,

      -v-                               3:16-CV-30

THE DANNON COMPANY, INC.,

                  Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

THE DANNON COMPANY, INC.,

                  Counter-Claimant,

      -v-

CHOBANI, LLC,

                  Counter-Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

APPEARANCES:                       OF COUNSEL:

FOLEY, HOAG LAW FIRM         JULIA HUSTON, ESQ.
Attorneys for Plaintiff          DAVID A. KLUFT, ESQ.
155 Seaport Boulevard        ANTHONY E. RUFO, ESQ.
Boston, MA 02210

HARRIS, BEACH LAW FIRM      DOUGLAS A. FOSS, ESQ.
Attorneys for Plaintiff         SVETLANA K. IVY, ESQ.
99 Garnsey Road
Pittsford, NY 13534

VENABLE LLP                 RANDALL K. MILLER, ESQ.
Attorneys for Defendant      MARCELLA BALLARD, ESQ.
8010 Towers Crescent Drive, Suite 300   ANGEL A. GARGANTA, ESQ.
Tysons Corner, VA 22182

SCOLARO, SHULMAN LAW FIRM          CHAIM J. JAFFE, ESQ.
Attorneys for Defendant
507 Plum Street, Suit 300
Syracuse, NY 13204

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

This is a dispute between Chobani, LLC ("Chobani") and The Dannon Company, Inc. ("Dannon"), direct competitors in the yogurt market, over what constitutes fair play in advertising. Chobani initially filed this action pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-02, seeking a determination that it had not made any false, misleading, disparaging, or deceptive statements or claims, as those terms are defined in the Lanham Act, 15 U.S.C. § 1125(a), in its recently launched online, print, and television advertising campaign (the "Simply 100 Campaign"), which touts the fact that Chobani's new "Simply 100 Greek Yogurt" contains no artificial sweeteners or preservatives while making certain comparisons to Dannon's yogurt offerings.

Dannon quickly answered Chobani's complaint, asserting counterclaims for false advertising and product disparagement pursuant to the Lanham Act and related state law based on the same advertising campaign Chobani sought to vindicate with a declaratory judgment. Dannon also moved for a temporary restraining order and a preliminary injunction, seeking to halt the Simply 100 Campaign pending a trial on the merits.

On January 11, 2016, an order issued denying Dannon's request, as counter-claimant, for a temporary restraining order. However, the parties were directed to expedite briefing on Dannon's request for a preliminary injunction, which Chobani, as counter-defendant, timely

opposed.  Oral argument was heard on January 22, 2016 in Utica, New York.  Decision was reserved.

## II.  BACKGROUND

The relevant facts have been drawn from the parties' submissions and are largely undisputed.  To the extent factual disputes exist, their resolution is unnecessary to the disposition of Dannon's motion.[1]

### A.  Dannon

Dannon has been producing yogurt and dairy products under various brand names since its founding in 1942 in Bronx, New York.  Rothman Decl. ¶ 4.  In the decades since its inception, Dannon has expended hundreds of millions of dollars building its brand equity and has developed a reputation as a trusted and reliable producer of yogurt and dairy products.  Id. ¶ 3.  These days, Dannon products are sold in, or offered by, over 35,000 retail and institutional outlets.  Id.

In 1988, Dannon first introduced "Dannon Light," a reduced-calorie, nonfat yogurt.  Rothman Decl. ¶ 5.  Thanks to the success of Dannon Light and other products now marketed under the umbrella of the "Dannon Light & Fit" brand name, Dannon has become famous in the United States for its light yogurts and has developed enormous consumer goodwill in its light product offerings.  Id.  In fact, not only is the "Dannon Light & Fit" brand

---

[1] Dannon also moved to expand the oral argument to include an evidentiary component, but later made clear that it only believed it to be necessary in the event that resolution of its motion turned on issues of credibility.  That request was denied.  Following oral argument, the parties' submissions were reviewed and it has been determined that an evidentiary hearing remains unnecessary.  See Md. Cas. Co. v. Realty Advisory Bd. on Labor Relations, 107 F.3d 979, 984 (2d Cir. 1997) ("Generally, the district court is not required to conduct an evidentiary hearing on a motion for a preliminary injunction when essential facts are not in dispute.").

the company's top seller, Dannon currently enjoys success as the leading brand of light yogurt in the United States.  Id. ¶¶ 5-6.

In 2012, and in line with developing health trends, Dannon produced "Light & Fit Greek," an eighty-calorie sub-brand of its "Light & Fit" product line and the first eighty-calorie Greek nonfat yogurt available on the market.  Rothman Decl. ¶ 7.  This light yogurt is "an ideal food option for individuals who need to be mindful of their sugar intake, and [is] targeted to health-conscious consumers, often women, who make purchasing decisions for themselves and for their families."  Id.

According to Dannon, its highest proportion of light yogurt sales routinely occurs during the first three months of the year, "as this is the time when most American consumers resolve to make positive changes relating to weight loss, fitness, and overall health and diet."  Rothman Decl. ¶¶ 8-9.  Importantly, this is also the time of year when consumers experiment with new yogurt products, such as Dannon Light & Fit Greek.  Id. ¶ 8.  Therefore, Dannon's marketing and sales efforts during each year's first quarter are crucial to the success of the business.  Id. ¶ 9.

## B. Chobani

Chobani may be a relative newcomer to the yogurt market when compared to Dannon, but it claims no less success.  Since opening its first factory in South Edmeston, New York, in 2005, Chobani has quickly become, in its own words, the "No. 1 Greek Yogurt brand in the United States."  McGuinness Decl. ¶¶ 2-4.

Chobani actively seeks to differentiate itself from its competitors in the market by emphasizing its commitment to "natural, non-GMO ingredients" and "environmental sustainability practices."  McGuinness Decl. ¶¶ 2, 6-7.  In its brief history, Chobani's

advertising efforts have pointedly communicated this message. For example, 2013 saw the launch of Chobani's "Go Real Chobani" campaign, which sought to "empower consumers to choose to live their lives in the same 'real' and 'authentic' way that Chobani makes yogurt." Id. ¶ 7. Likewise, in 2014, Chobani launched its "How Matters" campaign, seeking to communicate to consumers that "the way Chobani makes its yogurt is just as important as the final product." Id. More recently, in 2015, Chobani initiated its "To Love This Life Is [T]o Live It Naturally" campaign, "which celebrates the role that Chobani's products, made with only natural ingredients, play in fans' lives, and encourages fans to seek food made with the simplest ingredients possible." Id.

### C. The "Simply 100" Advertising Campaign

The advertising campaign at issue in this case purports to be an extension of Chobani's earlier advertising efforts. McGuiness Decl. ¶ 8. In particular, Chobani planned a multi-media blitz in connection with its latest offering, "Chobani Simply 100 Greek Yogurt," which has "100 calories per serving with no preservatives or artificial sweeteners." Id. Again, Chobani sought to "highlight its products' natural ingredients" and therefore "resolved to talk about the natural ingredients in Chobani Simply 100 Greek Yogurt, as well as the artificial preservatives and artificial sweeteners contained in some of its competitors' products, and to share its opinion on the subject." Id. The campaign, which consists of a video advertisement (the "Commercial"), a print advertisement (the "Print Ad"), and digital/social media content (the "Digital Content"), began running in early January 2016. Rothman Decl. ¶ 10.

### 1. __The Commercial__[2]

The Commercial's opening shot focuses on a cup of Dannon Light & Fit Greek Yogurt sitting on a table, which is immediately picked up by a young woman lounging in a pool chair. Rothman Decl. ¶ 11. As she scrutinizes the product's ingredients label, a voiceover proclaims: "Dannon Light & Fit Greek actually uses artificial sweeteners like sucralose. Sucralose? Why? That stuff has chlorine added to it!" Id. ¶ 11. In response to this revelation, the woman scrunches her face in disgust and tosses the cup of Dannon yogurt into a distant receptacle, resembling a trash bin, labeled "towels." See id.

Instead, the young woman selects a cup of Chobani Simply 100 Greek Yogurt sitting on a table to her right as a swimming pool becomes visible in the background. Rothman Decl. ¶ 12. The voiceover then states: "Now, there's Chobani Simply 100. It's the only 100 calorie light yogurt sweetened naturally." See id. As she tears open the packaging, the Commercial pans to a wide shot of the swimming pool, where a child jumps in, making a big splash. McGuinness Decl., Ex. A. The camera returns to the woman, now smiling contentedly, before finishing with a wide shot of the entire swimming pool scene. Id. Text laid over this final shot includes a hashtag: "#NOBADSTUFF." Id. As the Commercial ends, a cheerful jingle is heard playing in the background in which the singer states "to love this life is to live it naturally." McGuinness Decl. ¶ 11.

---

[2] A storyboard depicting still images and text from the Commercial is attached as Exhibit A to the McGuinness Declaration. The Commercial was also viewed at oral argument.

## 2. __The Print Ad__[3]

The Print Ad's header prominently displays a question:  "Did You Know Not All Yogurts Are Equally Good For You?"  Rothman Decl. ¶ 14.  The Print Ad continues, "[y]ou think you are doing something good for yourself and your family [b]y buying yogurt and instead of bad stuff [a]nd then you find that the bad stuff* [i]s in your yogurt!"  Id. ¶ 15.  The asterisk references a footnote printed at the very bottom of the full-page advertisement that explains, in a minuscule font size, that the "bad stuff" to which the Print Ad refers is "Artificial Ingredients."  Id.

The center of the Print Ad prominently depicts the ingredients label of a cup of Dannon Light & Fit Greek.  Rothman Decl. ¶ 15.  The text above and below the Dannon product mimics that of the Commercial's voiceover:  "There's sucralose used as a sweetener in Dannon Light & Fit Greek! Sucralose? Why? That stuff has chlorine added to it!"  Id.  The Print Ad goes on to state, "If you want to do healthy things, know what's in your cup. Chobani Simply 100 is the *only* 100-[c]alorie Greek Yogurt without a trace of any artificial sweeteners or artificial preservatives."  Id. (emphasis in original).

## 3. __Digital Content__[4]

The Digital Content consists of a website and corresponding social media efforts, including Facebook, Twitter, Pinterest, Google+, and Instagram.  Rothman Decl. ¶ 17.  Text on the website also poses a simple question, asking "Do You Know What's In Your Cup? . . . . Scroll over to compare our ingredients with those in other light yogurts to see

_____

[3]  The Print Ad is attached as Exhibit A to the Rothman Declaration.

[4]  Still images of the Digital Content are attached as Exhibit C to Dannon's Answer.

what's really inside[.]"  Id. ¶ 18.  The Digital Content includes an image of Dannon Light & Fit Greek that, when selected, displays the product's nutrition label and list several items identified as "artificial" in large, red font.  Id.  This portion of the campaign also contains a link to the Print Ad discussed above.  Id.

### D. Sucralose

Sucralose, the artificial ingredient at the center of this dispute, is a "zero-calorie, non-nutritive sweetener" that has been approved by the U.S. Food and Drug Administration ("FDA") for human consumption since 1999.  Townsend Decl. ¶ 5.  Sucralose has been extensively studied and the FDA has reviewed more than 110 safety studies in connection with its use as a general purpose sweetener for food.  Id.

Sucralose is a molecule with twelve carbon, nineteen hydrogen, eight oxygen, and three chlorine atoms linked together in a stable form that is safe to consume.  Townsend Decl. ¶ 9.  The molecule is manufactured through a process in which three atoms of chlorine are "substituted" for three hydrogen-oxygen groups on a sucrose molecule.  Id.  This trio of chlorine atoms are known in the scientific community as a "chloride," a compound of chlorine that is bound to another element or group.  Id. ¶ 12.  Such chlorides are found throughout nature and in numerous natural food sources ranging from simple table salt to cow's milk.  Id. ¶ 14.

Pool chlorine, on the other hand, is a colloquial term for calcium hypochlorite, a powerful bleach and disinfectant that is harmful if added to food or ingested.  Townsend Decl. ¶¶ 18-19.  This substance is distinct both chemically and practically from the chlorine atoms found in sucralose.  Id. ¶ 19.  Calcium hypochlorite is not found in, or used to manufacture, any of Dannon's products.  Id. ¶ 20.

## III.  LEGAL STANDARDS

### A.  Preliminary Injunction

"A preliminary injunction is an extraordinary remedy never awarded as of right."  Winter v. Nat'l Res. Def. Council, Inc., 555 U.S. 7, 24 (2008) (citing Munaf v. Green, 553 U.S. 674, 689-90 (2008)).  "The party seeking the injunction carries the burden of persuasion to demonstrate, 'by a clear showing,' that the necessary elements are satisfied."  Reckitt Benckiser Inc. v. Motomco Ltd., 760 F. Supp. 2d 446, 452 (quoting Mazurek v. Armstrong, 520 U.S. 968, 972 (1997)).

However, "[t]o say that there is confusion in this Circuit regarding the appropriate standard for assessing an application for a preliminary injunction would be an understatement."  Golden Krust Patties, Inc. v. Bullock, 957 F. Supp. 2d 186, 194 (E.D.N.Y. 2013).  For over fifty years, it was well-settled that a party seeking such relief was required to satisfy a two-pronged test:  (1) a showing of irreparable harm and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting relief.  See, e.g., Citigroup Global Mkts., Inc. v. VCG Special Opportunities Master Fund Ltd., 598 F.3d 30, 35 (2d Cir. 2010).

The confusion stems from the Supreme Court's 2008 decision in Winter, where the Court framed the preliminary injunction standard as a four-pronged test:  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  Winter, 555 U.S. at 20.

Two years later, the Second Circuit seemed to apply <u>Winter</u>'s teaching to create a

slightly reformulated version of its traditional test while evaluating a copyright case:

> **First**, as in most other kinds of cases in our Circuit, a court may issue a preliminary injunction in a copyright case only if the plaintiff has demonstrated either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the [plaintiff]'s favor. **Second**, the court may issue the injunction only if the plaintiff has demonstrated that he is likely to suffer irreparable injury in the absence of an injunction . . . . **Third**, a court must consider the balance of hardships between the plaintiff and defendant and issue the injunction only if the balance of hardships tips in the plaintiff's favor. [**Fourth**], the court must ensure that the public interest would not be disserved by the issuance of a preliminary injunction.

<u>Salinger v. Colting</u>, 607 F.3d 68, 79-80 (2d Cir. 2010) (emphases added) (internal citations

and quotations omitted).  And although this reformulated standard was limited to the

copyright context, the <u>Salinger</u> Court noted it could see no reason why it "would not apply

with equal force to an injunction in *any* type of case."  <u>Id</u>. at 77 n.7 (emphasis in original).

Following <u>Salinger</u>, our Circuit took a seemingly inconsistent approach to determining

when a preliminary injunction should issue.  <u>See</u> <u>Bullock</u>, 957 F. Supp. 2d at

193-94 (discussing various formulations of the standard in published and unpublished

post-<u>Salinger</u> dispositions); <u>see also</u> <u>Christian Louboutin S.A. v. Yves Saint Laurent Am.</u>

<u>Holdings, Inc.</u>, 696 F.3d 206, 215 (2d Cir. 2012) (reverting to traditional two-pronged test).

However, "[d]espite the seeming inconsistency of the standards for a preliminary

injunction set forth by the Supreme Court and the Second Circuit, the Second Circuit has

subsequently reaffirmed that its standard remains good law." <u>Marblegate Asset Mgmt. v.</u>

<u>Educ. Mgmt. Corp.</u>, 75 F. Supp. 3d 592, 604 (S.D.N.Y. 2014) (citing <u>Citigroup Global Mkts.,</u>

<u>Inc.</u>, 598 F.3d at 38).

Therefore, "[i]n addition to the two factors embraced by the Second Circuit's traditional analysis (concerning the strength of the plaintiff's claims and the irreparable harm suffered by the plaintiff absent injunctive relief), the post-Winter standard requires the Court to consider the public interest and to 'balance the competing claims of injury[.]'" Bullock, 957 F. Supp. 2d at 194 (quoting Salinger, 607 F.3d at 79).

Accordingly, a party must establish four elements to prevail on a motion for a preliminary injunction: (1) a likelihood of irreparable harm; (2) either a likelihood of success on the merits or sufficiently serious questions as to the merits plus a balance of hardships that tips decidedly in their favor; (3) that the balance of hardships tips in their favor regardless of the likelihood of success; and (4) that an injunction is in the public interest. Marblegate Asset Mgmt., 75 F. Supp. 3d at 604; see also Benihana, Inc. v. Benihana of Tokyo, LLC, 784 F.3d 887, 895 (2d Cir. 2015) (incorporating additional factors); Am. Civil Liberties Union v. Clapper, 785 F.3d 787, 825 (2d Cir. 2015) (same).

**B. Lanham Act**

Section 43(a) of the Lanham Act provides a cause of action for unfair competition through false advertising. 15 U.S.C. § 1125(a). As relevant here, the Act's language imposes liability on anyone who, "in connection with any goods or services . . . uses in commerce any . . . false or misleading description of fact, or false or misleading representation of fact, which . . . in commercial advertising or promotion, misrepresents the

nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities." § 1125(a)(1)(B).[5]

In other words, a so-called "false advertising" claim is a bit of a misnomer, since "[f]alsity [within the meaning of the Act] may be established by proving that (1) the advertising is literally false as a factual matter, or (2) although the advertisement is literally true, it is likely to deceive or confuse customers." Merck Eprova AG v. Gnosis S.p.A., 760 F.3d 247, 255 (2d Cir. 2014) (quoting S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001). Accordingly, "[t]he Lanham Act's false advertising provision allows a plaintiff to base its claim not only on statements that are literally false, but also on statements that are misleading when considered in their full context." Duty Free Ams., Inc. v. Estee Lauder Cos., Inc., 797 F.3d 1248, 1277 (11th Cir. 2015).

The first type of claim, one for "literal falsity," clearly captures falsehoods that are explicitly stated, i.e, any representation that is "false on its face." Time Warner Cable, Inc. v. DIRECTV, Inc., 497 F.3d 144, 153 (2d Cir. 2007). Importantly, however, literal falsity may also be "proved by implication." Sussman-Automatic Corp. v. Spa World Corp., 15 F. Supp. 3d 258, 270 (E.D.N.Y. 2014).

Pursuant to this "false by necessary implication doctrine," a claim for literal falsity also exists "when, considering the advertisement in its full context, the relevant audience would recognize the false implied claim as easily as if it had been stated explicitly." Pamlab, L.L.C. v. Macoven Pharms., L.L.C., 881 F. Supp. 2d 470, 476 (S.D.N.Y. 2012).

---

[5] Although "any person who believes that he or she is likely to be damaged by such [an] act" may bring suit, 15 U.S.C. § 1125(a)(1), the Second Circuit requires that the alleged misrepresentation be of an "inherent quality or characteristic of the product." S.C. Johnson & Son, Inc. v. Clorox Co., 241 F.3d 232, 238 (2d Cir. 2001).

"Under this doctrine, the court 'must consider the advertisement in its entirety and not . . . engage in disputatious dissection.'" <u>Pamlab, L.L.C.</u>, 881 F. Supp. 2d at 476 (quoting <u>Time Warner Cable, Inc.</u>, 497 F.3d at 158). "However, only an *unambiguous* message can be literally false. Therefore, if the language or graphic is susceptible to more than one reasonable interpretation, the advertisement cannot be literally false." <u>Id</u>.

"When an advertisement is proven to be literally false on its face, consumer deception is presumed, and the court may grant relief without reference to the advertisement's [actual] impact on the buying public." <u>Time Warner Cable, Inc.</u>, 497 F.3d at 153 (quoting <u>Coca-Cola Co. v. Tropicana Prods.</u>, 690 F.2d 312, 317 (2d Cir. 1982)). Consumer deception may also presumed "when the defendant intentionally set out to deceive the public, and the defendant's deliberate conduct in this regard [was] of an egregious nature." <u>C=Holdings B.V. v. Asiarim Corp.</u>, 992 F. Supp. 2d 223, 242 (S.D.N.Y. 2013) (citation and internal quotation marks omitted).

Alternatively, a party may pursue the second type of claim, known as an "implied claim," based on an theory that "the advertisement although literally true is nonetheless misleading." <u>Stokely-Van Camp, Inc. v. Coca-Cola Co.</u>, 646 F. Supp. 2d 510, 525 (S.D.N.Y. 2009). However, to succeed in a case where the statement at issue is not literally false, the claimant "must demonstrate, by extrinsic evidence, that the challenged commercials tend to mislead or confuse consumers," and also "that a statistically significant part of the commercial audience holds the false belief allegedly communicated by the challenged

advertisement." Tiffany (NJ) Inc. v. eBay Inc., 600 F.3d 93, 113 (2d Cir. 2010) (citations omitted).[6]

Accordingly, a party who seeks to prevail on a Lanham Act false advertising claim must ultimately show: "(1) a false or misleading statement; (2) in connection with commercial advertising or promotion that (3) was material, (4) was made in interstate commerce, and (5) damaged or will likely damage the plaintiff." C=Holdings B.V., 992 F. Supp. 2d at 242.

## IV. DISCUSSION

As an initial matter, Chobani seeks to raise the threshold for preliminary injunctive relief even further, characterizing Dannon's request to halt the Commercial, Print Ad, and Digital Content as one that mandates, rather than prohibits, an action.

This distinction matters, since a party seeking a "mandatory" preliminary injunction must demonstrate a "clear" or "substantial" likelihood of success on the merits in addition to the other strictures imposed by the standard discussed above. See Tom Doherty Assocs., Inc. v. Saban Entm't, Inc., 60 F.3d 27, 34 (2d Cir. 1995). According to Chobani, this sort of victory would also remove the "fair grounds for litigation" aspect of the preliminary injunction standard from consideration. See Chobani Mem. Opp'n at 9 n.2.

"[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, i.e., the situation that existed between the parties immediately

---

[6] All that is required at the preliminary injunction stage on this second type of claim is a showing that a "not insubstantial number" of consumers received a false or misleading impression from the challenged advertisement. SmithKline Beecham Consumer Healthcare, L.P. v. Johnson & Johnson-Merck Consumer Pharms. Co., Inc., 906 F. Supp. 178, 181 (S.D.N.Y. 1995) ("A full-blown survey need not be undertaken . . .; rather evidence such as expert witnesses' testimony may be used to demonstrate the public's reaction to an ad.").

prior to the events that precipitated the dispute." Asa v. Pictometry Intern. Corp., 757 F. Supp. 2d 238, 243 (W.D.N.Y. 2010).

In such cases, a preliminary injunction is understood to be "prohibitory"; that is, it "forbids or restrains an act" pending a trial on the merits of the dispute. Louis Vuitton Malletier v. Dooney & Bourke, Inc., 454 F.3d 108, 114 (2d Cir. 2006) (quoting BLACK'S LAW DICTIONARY 788 (7th ed. 1999)).

However, preliminary relief may also "order[ ] an affirmative act or mandate[ ] a specific course of conduct, such as requiring a defendant to turn over phone numbers featuring a tradename or to assign a trademark[.]" Louis Vuitton Malletier, 454 F.3d at 114 (internal citation and quotations omitted).[7] In those cases, the injunctive relief is understood to be "mandatory," and the heightened standard applies. Id.

Importantly, the "'[s]tatus quo' does not mean the situation existing at the moment the law suit is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft, 389 F.3d 973, 1013 (10th Cir. 2004) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2948 (2d ed. 1995)).

In this case, the "last peaceable uncontested status" was the state of affairs existing *before* Chobani launched its Simply 100 Campaign around the New Year, since the claims made in that advertising are what give rise to the underlying dispute. Indeed, district courts considering Lanham Act false advertising claims regularly apply the "prohibitory" standard when considering whether to issue a preliminary injunction. See, e.g., Schick Mfg., Inc. v.

---

[7] The heightened standard also applies where the preliminary injunction would "provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." Tom Doherty Assocs., Inc., 60 F.3d at 33-34.

Gillette Co., 372 F. Supp. 2d 273, 276 n.1 (D. Conn. 2005) (rejecting non-movant's assertion that requested injunction was mandatory and concluding that movant "seeks to prohibit allegedly false advertising, not to mandate action" in context of Lanham Act false advertising claim). Accordingly, the relief Dannon seeks here is "prohibitory" in nature.[8]

### 1. **Likelihood of Success on the Merits**

Dannon contends it is likely to succeed on its claim that Chobani's Simply 100 Campaign is "literally false by necessary implication," because the statements about added chlorine convey the literally false message that the sucralose contained in Dannon's Light & Fit Greek renders it unsafe to eat.

Chobani defends its sweetener comparison claims by arguing that, not only is it literally true that sucralose has "chlorine added to it," but that the other challenged messages—that its products are "good" or that Dannon's artificial ingredients are "bad stuff"—are merely "puffery," statements of Chobani's own opinion about the superiority of its own natural products.

This argument is unpersuasive. "Puffery is an exaggeration or overstatement expressed in broad, vague, and commendatory language." Castrol Inc. v. Pennzoil Co., 987 F.2d 939, 945 (3d Cir. 1993); see also Lipton v. Nature Co., 71 F.3d 464, 474 (2d Cir. 1995) ("Subjective claims about products, which cannot be proven either true or false, are not actionable under the Lanham Act." (citation omitted)). "A puffing statement is not actionable because the audience for the statement cannot be deceived by it; it is quintessential 'sales

---

[8] In any event, the result would be the same under the heightened standard, as will be made plain below.

talk . . . to be discounted as such by the buyer.'"  <u>Sussman-Automatic Corp.</u>, 15 F. Supp. 3d at 270 (citation omitted).

"[B]ut an advertiser treads a far different line when it not only lauds its own products, but directly attacks a competitor."  <u>Garden Way, Inc. v.  Home Depot, Inc.</u>, 94 F. Supp. 2d 276, 278 (N.D.N.Y. 2000) (Kahn, J.).  While the phrase "no bad stuff," if untethered to any comparison claim specifically referencing Dannon's product, may be considered the sort of commendatory overstatement incapable of deceiving a consumer, the Simply 100 Campaign[9] employs that negative phrasing in connection with other statements and images that paint Dannon's products as a safety risk because they contain sucralose.  <u>Cf</u>. <u>Church & Dwight Co., Inc. v. Clorox Co.</u>, 840 F. Supp. 2d 717, 721 (S.D.N.Y. 2012) (noting certain assertions "may necessarily imply more sweeping claims about that product").

Putting aside the fact that Chobani's statements about "chlorine" may be literally true,[10] courts regularly recognize that even where "no combination of words" found in the advertisement is untrue, the message conveyed by the advertisement may still be "literally false" if its clear meaning, considered in context, is false.  <u>Time Warner Cable, Inc.</u>, 497 F.3d at 154-55; <u>see also</u> RESTATEMENT (THIRD) OF UNFAIR COMPETITION § 3 cmt. d. (1995) ("Some

---

[9]  Although portions of the Digital Content do not make these kind of claims in the context of product comparisons, it also includes a link to a fully reproduced version of the Print Ad.  Therefore, these two aspects of the campaign are considered in tandem.

[10]  Although it is unnecessary to resolve at this juncture, it is not entirely clear that this statement *is* literally true.  The challenged statement claims that chlorine is "added to" sucralose.  But if sucralose is created by adding chlorine to a precursor compound, then it is inaccurate to say chlorine is "added to" sucralose, since (a) the sucralose compound does not exist until the chlorine is actually combined with the precursor compound, and (b) adding additional chlorine to an existing sucralose compound, already stable, would likely have no effect.  Therefore, it would be far more accurate to say "that stuff has chlorine added to [make] it."  George W. Gokel, Ph.D., Chobani's proffered expert, states as much in his declaration.  <u>See</u> Gokel Decl. ¶ 25 ("Accordingly, it is scientifically accurate to state that chlorine has been added *to form sucralose* . . . .") (emphasis added).

representations of opinion may imply the existence of facts that justify the opinion, or at least that there are no facts known to the speaker that are substantially incompatible with the stated opinion.").

For example, in <u>Polar Corp. v. Coca-Cola Co.</u>, the Court preliminarily enjoined Polar, a seltzer company, from broadcasting a thirty-second commercial featuring

> [A] computer-generated polar bear that examines a Coke can, makes an unhappy sound and flips the can over his shoulder into a trash bin. A sign over the bin reads 'Keep the Arctic Pure.' The polar bear then reaches down into the freezing, Arctic water and pulls out a can of Polar Seltzer. He (or she) then drinks the Polar soda and smiles contentedly.

871 F. Supp. 1520, 1521 (D. Mass. 1994). The Court found that this commercial "implied that Coke is not pure" and, given that there was "no evidence suggesting" that to be to true, this was a "misrepresentation of the nature and quality of Coke." <u>Id</u>. The Court further found that Coca-Cola was "engaged in an industry that relie[d] heavily on the consumer's perception of quality and purity," and thus irreparable harm would likely accrue as a result of this falsehood. <u>Id</u>.

With these principles in mind, it is easy to conclude that Dannon, as counter-claimant here, has demonstrated a substantial likelihood of success on the merits of its false advertising claim, since it is likely that a factfinder would conclude that the challenged aspects of the Simply 100 Campaign unambiguously convey the literally false message that Dannon's product contains sucralose and is therefore unsafe to consume.[11] <u>N. Am. Olive Oil Ass'n v. Kangadis Food Inc.</u>, 962 F. Supp. 2d 514, 520 (S.D.N.Y. 2013) ("The question

---

[11] Product safety is clearly an "inherent quality or characteristic" sufficient to meet the materiality requirement.

here . . . is not whether a reasonable trier of fact *could* find [advertiser's claim] literally false, but whether it is *likely* to do so."  (emphases in original)).

Although Chobani suggested at oral argument that the question of sucralose's safety is still the subject of legitimate scientific debate, there is little support in the record for that proposition.[12]  To the contrary, the balance of record evidence reflects that sucralose is an unusually well-studied compound repeatedly determined to be safe for ordinary consumption.  Cf. Time Warner Cable, Inc. v. DIRECTV, Inc., 475 F. Supp. 2d 299, 306 (S.D.N.Y. 2007) ("The commercial's assertion that a viewer cannot 'get the best picture without DIRECTV' is therefore likely to be proven *literally false*, in that the undisputed factual record here establishes that [both parties] provide [ ] pictures of equal quality."  (emphasis added)), vacated in part on other grounds by 497 F.3d at 163.

To be sure, the Simply 100 Campaign is factually distinguishable in certain respects from Polar Corp. and the other cases cited by Dannon.  But the aggregate similarities far outweigh the reasonable distinctions.  Indeed, accepting Chobani's arguments would amount to the sort of "disputatious dissection" forbidden in this analysis.  Accordingly, Dannon is likely to prevail on the merits of its Lanham Act false advertising counter-claim.

## 2. Likelihood of Irreparable Harm

Dannon contends it has suffered, and will continue to suffer, substantial injury from Chobani's Simply 100 advertising campaign, including but not limited to loss of sales, market

---

[12]  Dr. Gokel's declaration states that some research suggests high doses of sucralose can result in toxicity.  But this suggestion is almost meaningless, since any substance, including table salt and drinking water, exhibits toxicity when a sufficient amount is consumed.  In other words, there is no evidence to substantiate a claim that sucralose consumed at rates consistent with, say, the amount found in Dannon Light & Fit Greek, causes any harm.  Even then, it is telling that although Chobani's own products indisputably contain the same "type" of chlorine (e.g. that found in all-natural, non-GMO milk), Chobani apparently makes no mention of such a fact in its Simply 100 Campaign.

share, and goodwill.  Dannon also claims that a presumption of irreparable harm exists where, as here, a party has established a likelihood of success on a claim that its product was specifically identified in a false, comparative advertisement.  Chobani argues that the presumption of harm on which Dannon relies has since been abrogated, and that Dannon has failed to adduce any non-speculative evidence to support the requisite showing of irreparable injury.

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction."  Reckitt Benckiser Inc., 760 F. Supp. 2d at 452 (quoting Rodriguez ex rel. Rodriguez v. DeBuono, 175 F.3d 227, 233-34 (2d Cir. 1999)).  Historically, a plaintiff who successfully demonstrated a likelihood of success in showing the literal falsity of a "defendant's comparative advertisement mentioning the plaintiff[']s product by name" was entitled to a presumption of irreparable harm.  Id. at 453.  "This is because a false 'comparison to a specific competing product necessarily diminishes that product's value in the minds of the consumer.'"  Time Warner Cable, Inc., 497 F.3d at 162 (quoting McNeilab, Inc. v. Am. Home Prods. Corp., 848 F.2d 34, 38 (2d Cir. 1988)).

Here, the parties are obviously direct competitors with respect to the products at issue.  Rothman Decl. ¶ 10.  And as discussed above, the allegedly false message was made in the context of an advertising campaign explicitly referencing Dannon's product.  This fact, combined with the fact that Dannon has satisfied its burden of showing a substantial likelihood of success on its literal-falsity-by-necessary-implication claim, would ordinarily result in a presumption of irreparable harm.

However, as Chobani suggests, "it may be that this presumption of irreparable harm is no longer permissible and that the longstanding precedent referenced above has given way

to a new standard." <u>Reckitt Benckiser Inc.</u>, 760 F. Supp. 2d at 453.  For example, in a

Lanham Act copyright case, the Second Circuit has cautioned that a "court must not adopt a

'categorical' or 'general' rule or presume that the plaintiff will suffer irreparable harm (unless

such a 'departure from the long tradition of equity practice' was intended by

Congress)." <u>Salinger</u>, 607 F.3d at 80 (quoting <u>eBay, Inc. v. MercExchange, L.L.C.</u>, 547 U.S.

388, 393-94 (2006)).

     In fact, other Circuits have gone so far as to expressly eliminate the

presumption.  <u>See, e.g.</u>, <u>Ferring Pharms., Inc. v. Watson Pharms., Inc.</u>, 765 F.3d 205, 216

(3d Cir. 2014) ("Because a presumption of irreparable harm deviates from the traditional

principles of equity, which require a movant to demonstrate irreparable harm, we hold that

there is no presumption of irreparable harm afforded to parties seeking injunctive relief in

Lanham Act cases."); <u>Herb Reed Enters., LLC v. Fla. Entm't Mgmt., Inc.</u>, 736 F.3d 1239,

1249 (9th Cir. 2013) ("[T]he landscape for benchmarking irreparable harm has changed with

the Supreme Court's decisions in [<u>eBay Inc.</u>] in 2006 and <u>Winter</u> in 2008.").

     But even assuming the presumption of irreparable harm is no longer available,

Dannon has still carried its burden on this element.  "It is virtually impossible to prove that so

much of one's sales will be lost or that one's goodwill will be damaged as a direct result of a

competitor's advertisement." <u>Coca-Cola Co. v. Tropicana Prods., Inc.</u>, 690 F.2d 312, 316 (2d

Cir. 1982).  Therefore, "[t]o demonstrate irreparable harm in a Lanham Act case, a party

must show two things:  (i) that the parties are competitors in the relevant market; and (ii) that

there is a logical causal connection between the alleged false advertising and its own sales

position." <u>CJ Prods. LLC</u>, 809 F. Supp. 2d at 149 (citation and internal quotation marks

omitted).

As noted above, there is no question that the parties here are in direct competition in the relevant market, no matter how that term is defined. In fact, not only do they compete generally in the health food and yogurt markets, but also specifically in the market for low-calorie Greek yogurt products. And it is likewise easy to conclude that a logical causal connection exists between the alleged false advertising at issue and Dannon's own sales position, since "the sales of one party's products would certainly impact the sale of the other party's product." CJ Prods. LLC, 809 F. Supp. 2d at 149.

Indeed, "no detailed study of consumer reactions is necessary to conclude inferentially that [the advertiser] is likely to divert customers from [the competitor's] product to its own unless the offending commercial is enjoined." Church & Dwight Co., Inc., 840 F. Supp. 2d at 727; see also N.Y.C. Triathlon, LLC v. NYC Triathlon Club, Inc., 704 F. Supp. 2d 305, 343 (S.D.N.Y. 2010) (noting that "[p]rospective loss of [ ]good will alone is sufficient to support a finding of irreparable harm"). Accordingly, Dannon has satisfied its burden of demonstrating irreparable harm.

### 3. **Balance of Hardships**

As discussed above, Dannon has demonstrated irreparable harm if the literally false statements made in the Simply 100 advertising campaign continue to be disseminated. As for Chobani, it cannot assert an equitable interest in perpetuating false claims generally, let alone ones that specifically single out a competitor's product. See, e.g., CJ Prods. LLC, 809 F. Supp. 2d at 149 ("Defendants are unable to assert an equitable interest in continuing a false advertising campaign."); Reckitt Benckiser Inc., 760 F. Supp. 2d at 456-57 (noting a party cannot "assert an equitable interest in the perpetuation of an advertising campaign that is literally false"). Therefore, the balance of hardships favors Dannon.

### 4.  **Public Interest**

"'In exercising their sound discretion, courts of equity should pay particular regard [to] the public consequences in employing the extraordinary remedy of injunction.'"  Winter, 555 U.S. at 24 (quoting Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982)).

It is self-evident that preventing false or misleading advertising is in the public interest.  See N. Am. Olive Oil Ass'n, 962 F. Supp. 2d at 524 (noting public interest would be "well served by ensuring that consumers do not purchase a product based on false advertising"); see also Osmose, Inc. v. Viance, LLC, 612 F.3d 1298, 1321 (11th Cir. 2010) ("[T]he public interest is served by preventing customer confusion or deception.").

If anything, this interest is heightened when the information pertains to serious issues, such as those concerning food safety.  Cf. CJ Prods. LLC, 809 F. Supp. 2d at 149 ("The public has a strong interest in receiving accurate information, especially when it comes to products marketed specifically for children.").  Therefore, the issuance of an injunction would be in the public interest.

### 5.  **Summary**

Dannon has demonstrated, by a clear showing, that the necessary elements are satisfied.  Therefore, the only question remaining is whether, and for what value, Dannon must post a bond.  See FED. R. CIV. P. 65(C) ("The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained.").

The parties agreed at oral argument that a bond in the amount of $1,000,000 would be appropriate.  After careful consideration of the factors set forth above, and mindful of the

"broad discretion" afforded a district court "in the matter of setting the sum for security," departure from this agreed-upon value would be unwarranted.  See CJ Prods. LLC, 809 F. Supp. 2d at 163.  Accordingly, Dannon will be required to post a bond in the sum of $1,000,000.

## IV.  CONCLUSION

Chobani is free to continue to spread its message about the value of selecting natural ingredients.  It is not, however, free to disseminate the false message that sucralose renders Dannon's products unsafe to consume.

Therefore, it is

ORDERED that

1.  Dannon's motion for a preliminary injunction is GRANTED;

2.  Chobani, its agents, its servants, its employees, and its officers, and all other persons in active concert or participation with it who receive actual notice of this Preliminary Injunction, by personal service or otherwise, are hereby enjoined and restrained, pending the final determination of this action, from disseminating or causing to be disseminated anywhere in the United States, via television, radio, printed publications, and all Internet transmissions, including, but not limited to:

a.  The Commercial;

b.  The Print Ad;

c.  The Digital Content;

d.  The following claims in its marketing and advertising as they relate to Dannon products:

i.  Dannon products, including Dannon Light & Fit Greek, contain chlorine and Chobani products, including Chobani Simply 100 Greek, do not;

ii.  Dannon products, including Dannon Light & Fit Greek, are unhealthy because they contain chlorine and Chobani products, including Chobani Simply 100 Greek, are healthy because they do not contain chlorine;

iii.  Dannon products, including Dannon Light & Fit Greek, contain pool chlorine, a dangerous chemical used to clean swimming pools;

iv.  Sucralose is bad or unsafe for consumers;

v.  Dannon products, including Dannon Light & Fit Greek, are unsafe, harmful, and/or unhealthy; and

vi.  Use of the term "no bad stuff" as it relates to Dannon products, including Dannon Light & Fit Greek;

3.  Dannon shall post an undertaking within five (5) business days of the entry of this Order with the Clerk of the Court in the sum of $1,000,000 as security for the payment of such costs and damages as may be incurred or suffered by Chobani; and

4.  The preliminary injunction shall go into effect immediately upon acceptance of the required security by the Clerk of the Court.

IT IS SO ORDERED.

_____
United States District Judge

Dated:  January 29, 2016
        Utica, New York.